OPINION OF THE COURT
Vito M. DeStefano, J.
Motion sequence No. 1 by the defendant Volkswagen Group of America, Inc. doing business as Audi of America, Inc. (Audi) pursuant to CPLR 3211 (a) (1) and (7) for judgment dismissing the instant action insofar as asserted against it is granted to the extent that the complaint is dismissed insofar as asserted against it, except as to the ninth cause of action, with respect to which the motion is denied.
*758 Motion sequence No. 2 by defendants Stanley Weinstock and Biener Auto Group, Inc. (collectively referred to as the Biener defendants) pursuant to CPLR 3211 (a) (1) and (7), and CPLR 3013, for judgment dismissing the seventh, twelfth, thirteenth and fourteenth causes of action asserted against them is granted.
Background
Plaintiff, JJM Sunrise Automotive, LLC doing business as Lynbrook Audi (JJM), is a company founded in April 2013, for the purpose of acquiring the assets of Anchor South Shore, Inc. doing business as Anchor Audi (Anchor Audi) and obtaining the rights to an Audi dealership. Anchor Audi operated an Audi dealership located at 843 Sunrise Highway in Lynbrook, New York. On May 28, 2013, JJM and Audi entered into a dealer agreement pursuant to which JJM became an authorized Audi dealer (exhibit 1 to motion sequence No. 1).
The dealer agreement incorporated the standard provisions agreement (standard provisions) (exhibit 2 to motion sequence No. 1). The standard provisions expressly state that Audi does “not give Dealer any exclusive right to sell or service Authorized Products in any area or territory.” The standard provisions also provides that it “contains the entire agreement between the parties” (exhibit 2 to motion sequence No. 1, arts 2 [1]; 17 [4]).
Audi and JJM also entered into a facility construction agreement pursuant to which JJM agreed to relocate the “Dealer Premises to a Corporate Identity-compliant Audi Sales Facility” and be bound by the terms of the construction agreement and the First Amendment. In the facility construction agreement, JJM acknowledged that Audi “made no representations, promises or warranties that Dealer’s Operations will be financially successful in either the short or long term” (facility construction agreement ¶¶ 1, 8).
At the time JJM acquired the assets of Anchor Audi and became obligated to construct a new Audi dealership, there was only one other Audi dealership in Nassau County, defendant Biener Auto Group, Inc. (Biener Auto). Defendant Stanley Weinstock is the president of Biener Auto. JJM’s claims against all of the defendants arise out of the disclosure by Audi in a letter dated December 19, 2013 that Biener Auto, with the approval of Audi, intends to establish a new Audi dealership at 1038 Brush Hollow Road in Westbury, New York (exhibit 3 to motion sequence No. 1).
*759 On January 9, 2014, approximately three weeks after Audi’s letter, JJM advised Audi that it proposed to relocate its Lynbrook dealership to North Franklin Street in Hempstead, New York (exhibit 4 to motion sequence No. 1). By letter dated March 11, 2014, Audi refused to consent to JJM’s proposed relocation to Hempstead (exhibit 5 to motion sequence No. 1).
On April 15, 2014, JJM commenced the instant action against Audi and the Biener defendants alleging 17 causes of action.
Audi moves for an order pursuant to CPLR 3211 (a) (1) and (7) dismissing the complaint insofar as asserted against it. The Biener defendants also move for an order pursuant to CPLR 3211 (a) (1) and (7), and CPLR 3013 dismissing the seventh, twelfth, thirteenth and fourteenth causes of action asserted against them.
For the reasons that follow, Audi’s motion is granted in part and denied in part and the Biener defendants’ motion is granted.
Audi’s Motion to Dismiss the Statutory Violations Alleged in the Complaint
The first seven, as well as seventeenth, causes of action in JJM’s complaint allege claims under the Franchised Motor Vehicle Dealer Act (the Dealer Act), codified in article 17-A of the Vehicle and Traffic Law. A franchisee, such as JJM, aggrieved by an alleged violation of the Dealer Act, may sue the franchisor, here Audi, for injunctive relief and damages (Vehicle and Traffic Law § 469 [1]).[1]
First Cause of Action
In the first cause of action, JJM seeks a judgment declaring that the approval of a new Audi franchise in Westbury, New York is a modification of JJM’s franchise contract that will substantially and adversely affect JJM’s investment in violation of Vehicle and Traffic Law § 463 (2) (ff). In the complaint, JJM specifically alleges that Audi’s
“planned action in (a) awarding a new open point Audi dealership in Nassau County, (b) awarding this new open point Audi dealership to Biener Auto— the only other competing Audi dealer in Nassau County, and (c) locating the new, open point Audi *760 dealership in the Westbury, New York market area would result in a legal or de facto modification of JJM’s Audi Franchise”; the actions of Audi will “materially degrade” JJM’s sales and service operations; the actions of Audi will “adversely affect JJM Audi’s ‘rights, obligations, investment or return on investment,’ within the meaning of section 463 (2) (ff)” of the Dealer Act; and that an actual and justiciable controversy exists between JJM and Audi concerning the proposed award of a new open point Audi dealership in Westbury (exhibit A to motion sequence No. 2 ¶¶ 97-101).
Pursuant to Vehicle and Traffic Law § 463 (2) (ff) (1):
“It shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract . . .
“[t]o modify the franchise of any franchised motor vehicle dealer unless the franchisor notifies the franchised motor vehicle dealer, in writing, of its intention to modify the franchise of such dealer at least ninety days before the effective date thereof, stating the specific grounds for such modification.”
A cause of action under this provision requires the franchisor to prove that the modification is fair and not prohibited (Vehicle and Traffic Law § 463 [2] [ff] [3]).[2] The statute defines “modify” or “modification” as “any change or replacement of any franchise if such change or replacement may substantially and adversely affect the new motor vehicle dealer’s rights, obligations, investment or return on investment” (Vehicle and Traffic Law § 463 [2] [ff] [2]). JJM alleges that “the opening of a third Nassau County Audi dealership in Westbury would instantly degrade JJM Audi’s sales, service, lease and parts revenues by twenty percent (20%) or more” (exhibit A to motion sequence No. 2 ¶ 80).[3]
*761 Second Cause of Action
In the second cause of action, JJM alleges that Audi’s “bad faith conduct and wrongful acts” violated section 466 (2) of the Dealer Act which provides:
“It shall be deemed an unreasonable restriction upon the sale or transfer of a dealership for a franchisor (i) directly or indirectly to prevent or attempt to prevent a franchised motor vehicle dealer from obtaining the fair value of the franchise or the fair value of the dealership business as a going concern
Third Cause of Action
Pursuant to Vehicle and Traffic Law § 463 (2) (d) (1), it shall be unlawful for any franchisor to “terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer except for due cause, regardless of the terms of the franchise.” JJM alleges in the third cause of action that Audi violated Vehicle and Traffic Law § 463 (2) (d) (1) because Audi’s actions toward JJM “will result in significant and substantial damages to JJM Audi, including the destabilization and potential destruction of JJM Audi’s business”; that Audi’s actions are “restrictions upon JJM Audi’s right to own and operate an Audi America franchised dealership and will seriously impair JJM Audi’s parts, leasing, service and sales business”; and that Audi’s actions toward JJM are “tantamount to a constructive termination of the Dealer Agreement without due cause.”
Fourth Cause of Action
In the fourth cause of action, JJM alleges that Audi’s bad faith conduct and wrongful acts violate section 463 (2) (b) of the Dealer Act, in which it states: “It shall be unlawful for any franchisor . . . [t]o do any other act prejudicial to the monetary interest or property rights of said dealer by threatening to cancel any unexpired contractual agreement existing between such franchisor and said dealer.”
Fifth Cause of Action
In the fifth cause of action, JJM also alleges that Audi’s bad faith conduct violates section 463 (2) (c) (1) of the Dealer Act, which states:
“It shall be unlawful for any franchisor . . .
“[t]o condition the renewal or extension of a franchise on a franchised motor vehicle dealer’s substantial renovation of the dealer’s place of business or on the construction, purchase, acquisition or *762 rental of a new place of business by the franchised motor vehicle dealer unless the franchisor has advised the franchised motor vehicle dealer in writing of its intent to impose such a condition within a reasonable time prior to the effective date of the proposed date of renewal or extension (but in no case less than one hundred eighty days) and provided the franchisor demonstrates the need for such change in the place of business and the reasonableness of such demand in view of the need to service the public and the economic conditions existing in the automobile industry at the time such action would be required of the franchised motor vehicle dealer.”
Sixth Cause of Action
The premise of the sixth cause of action, which is an alleged violation of Vehicle and Traffic Law § 463 (2) (dd), is not based upon Audi’s opening of the new dealership in Westbury but, rather, based upon Audi’s refusal to allow JJM to relocate its dealership to Hempstead.
Pursuant to Vehicle and Traffic Law § 463 (2) (dd), it shall be unlawful for any franchisor
“[t]o unreasonably prevent or refuse to approve the relocation of a dealership to another site within that dealership’s relevant market area. The dealership must provide prior written notice providing the address of the proposed new location and a site plan of the proposed facility. The franchisor must, within sixty days of receipt of such information, grant or deny the dealer’s relocation request. Failure to timely deny the request shall be deemed consent to the relocation.”
Seventh Cause of Action
In the seventh cause of action, asserted against all of the defendants, JJM contends that Audi’s conduct constitutes a violation of the Dealer Act, and that in the event Audi is permitted to constructively terminate the dealer agreement, JJM Audi will “potentially suffer the loss of its entire business” and “cease to be a viable business” (exhibit A to motion sequence No. 2 ¶¶ 136-138).
JJM alleges that it has no adequate remedy at law and, thus, is entitled to injunctive relief under Vehicle and Traffic Law §§ 463 (2) (ff) (3) and 469 (1) which state:
“If any franchised motor vehicle dealer who receives a written notice of modification institutes an action *763 within one hundred twenty days of receipt of such notice as provided in section four hundred sixty-nine of this article to have a review of the threatened modification, such action shall serve to stay, without bond, the proposed modification until a final judgment has been rendered in an adjudicatoiy proceeding or action as provided in section four hundred sixty-nine of this article. A modification is deemed unfair if it is not undertaken in good faith; is not undertaken for good cause; or would adversely and substantially alter the rights, obligations, investment or return on investment of the franchised motor vehicle dealer under an existing franchise agreement. In any action brought by the dealer, the franchisor shall have the burden of proving that such modification is fair and not prohibited” (Vehicle and Traffic Law § 463 [2] [ft] [3]).
“Private actions.
“1. A franchised motor vehicle dealer who is or may be aggrieved by a violation of this article shall be entitled ... to sue for, and have, injunctive relief and damages in any court of the state having jurisdiction over the parties. In any such judicial action or proceeding, the court may award necessary costs and disbursements plus a reasonable attorney’s fee to any party” (Vehicle and Traffic Law § 469 [1]).
JJM asserts that according to the Dealer Act and CPLR 6301, it is entitled to preliminary and permanent injunctive relief, enjoining the defendants from
“terminating, suspending, canceling, limiting or otherwise restricting JJM Audi’s rights under the Dealer Agreement and its right to own and operate an Audi America Franchised motor vehicle dealership free from same-brand competition within the relevant market territory; establishing a new Audi open point dealership in Westbury, New York; or otherwise interfering with JJM Audi’s fundamental rights as a Franchised automobile dealer in the State of New York” (exhibit A to motion ¶ 142).
Seventeenth Cause of Action
In the seventeenth cause of action, JJM seeks recovery of its “necessary costs and disbursements plus a reasonable attorney’s fee” pursuant to Vehicle and Traffic Law § 469 (1).
*764 Audi’s Argument for Dismissal of the Alleged Statutory Violations and the Court’s Determination
Audi asserts that the Dealer Act provides only one statutory basis to challenge a decision to approve a new dealership—that is, under Vehicle and Traffic Law § 463 (2) (cc) (l),[4] pursuant to which a franchisor must establish good cause for the addition of a new dealership into the “relevant market area” of an existing dealership. As applicable to the facts at bar, the “relevant market area” is defined as a radius of six miles from the existing dealer’s principal place of business. It is undisputed that the proposed dealership to be located in Westbury is not within the six-mile “relevant market area” of JJM’s dealership in Lynbrook (exhibit A to motion sequence No. 2 ¶ 73).
According to Audi, a specific and comprehensive framework for challenging a determination to approve a new dealership reflects the intent of the legislature to allow such claims only when the relevant market area is compromised.
“The analysis of whether good cause exists for establishing a new dealership is in the province of the courts only when the proposed new dealership is to be located in an existing dealer’s relevant market area. Where, as here, the proposed dealership is to be located outside of an existing dealer’s relevant market area, the Legislature, by not granting existing dealers standing to bring an action to force *765 franchisors to prove good cause, has as a matter of policy found the risk of eroding an existing dealer’s investment too remote to deprive the public of the benefits of having a new dealership in the market . . . (Audi’s mem of law in support at 6.)
Although none of the causes of action asserted in JJM’s complaint are premised upon Vehicle and Traffic Law § 463 (2) (cc), the first, second, third, fourth, fifth and seventh causes of action, alleging violations of other sections of the Vehicle and Traffic Law’s Dealer Act, are actually premised upon Audi’s approval of a new dealership. Accordingly, the initial issue before the court is whether Vehicle and Traffic Law § 463 (2) (cc), which specifically applies to the opening of a new dealership within a relevant market area, is the exclusive section upon which JJM can challenge the opening of the proposed same line make dealership, which is undisputably outside JJM’s relevant market area.
The Court’s Determination as to the Alleged Statutory Violations
On a motion to dismiss, the complaint is to be afforded a liberal construction, the facts alleged are presumed to be true, the plaintiff is afforded the benefit of every favorable inference, and the court is to determine only whether the facts as alleged fit within any cognizable legal theory (Simkin v Blank, 19 NY3d 46, 52 [2012]; Leon v Martinez, 84 NY2d 83, 87-88 [1994]). When a party moves under CPLR 3211 (a) (7) for dismissal based on the failure to state a cause of action, the test is whether the pleading states a cause of action, not whether the plaintiff has a cause of action (Sokol v Leader, 74 AD3d 1180, 1180-1181 [2d Dept 2010]). “Whether a plaintiff can ultimately establish [his or her] allegations is not part of the calculus in determining a motion to dismiss” (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). However, conclusory averments of wrongdoing are insufficient to sustain a complaint unless supported by allegations of ultimate facts (DiMauro v Metropolitan Suburban Bus Auth., 105 AD2d 236 [2d Dept 1984]). Thus, bare legal conclusions and factual allegations
“flatly contradicted by [documentary evidence in] the record are not presumed to be true and, ‘[i]f the documentary proof disproves an essential allegation of the complaint, dismissal pursuant to CPLR 3211 (a) (7) is warranted even if the allegations, standing *766 alone, could withstand a motion to dismiss for failure to state a cause of action’ ” (Deutsche Bank Natl. Trust Co. v Sinclair, 68 AD3d 914, 915 [2009], quoting Peter F. Gaito Architecture, LLC v Simone Dev. Corp., 46 AD3d 530, 530 [2007]).
In the absence of an explicit expression of legislative intent or mandate concerning the issue under discussion, to wit, the exclusivity of section 463 (2) (cc), it is necessary to consider the relevant language and intent of the Dealer Act and the rules governing the interpretation of statutes.
When interpreting a statute, the court must endeavor to give effect to the intent of the legislature.[5] The “primary consideration of the courts in the construction of statutes is to ascertain and give effect to the intention of the Legislature” (McKinney’s Cons Laws of NY, Book 1, Statutes § 92). Statutes are construed as a whole and all parts thereof are to be read and construed together to determine the legislative intent (Statutes § 97). All parts of a statute are to be harmonized with each other as well as with the general intent of the whole statute, so as to give effect to every term of the statute (Statutes § 98). “Whenever there is a general and a particular provision in the same statute, the general does not overrule the particular but applies only where the particular enactment is inapplicable” (Statutes § 238). And, of course, where a statute expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded (Statutes § 240).
The Dealer Act, with great particularity, establishes a relevant market area, imposes a notice requirement on franchisors if a same line make dealership is to be added/relocated into the *767 relevant market area, and creates a right of action in the dealer in the event that a dealership is so introduced, with the burden of proof being placed on the franchisor to show good cause for the addition/relocation. The natural and logical conclusion to be drawn from this specific legislative pronouncement, which involves the creation of legal rights and duties, is that it provides the exclusive means of establishing a Dealer Act right of action based on the addition/relocation of a same line make dealership. To conclude otherwise—that is, to interpret the other sections of the Dealer Act cited by JJM so as to permit the assertion of claims of “modification,” “constructive termination,” “devaluing” and “acts prejudicial to the monetary interest or property rights of the dealer,” based on the addition/relocation of a same line make dealership outside the relevant market area, would render meaningless the relevant market area limitation in the Dealer Act and the cause of action that it creates. Consequently, the addition/relocation of a same line make dealership outside the relevant market area creates no Dealer Act right of action.
This conclusion is supported by reference to decisions from other jurisdictions, in which courts have concluded, under similar circumstances and with similar statutes, that a specific statutory provision dealing with the establishment of a new franchise dealership within a relevant market area is the sole provision under which an existing dealer could seek relief from the addition/relocation of another dealership within or outside of the existing dealer’s relevant market area.
For example, in American Honda Motor Co., Inc. v Bernardi's, Inc. (432 Mass 425, 735 NE2d 348 [2000]), Massachusetts’ highest court held that a challenge to a proposed new dealership was governed exclusively by the specific statute covering motor vehicle franchises. The statute limited protests to those where the proposed new dealership would fall within an existing dealer’s “relevant market area.” Specifically, American Honda involved two Massachusetts statutes. Former Mass Gen Laws ch 93B, § 4 (3) (1) proscribed the improper granting of “a franchise . . . with an additional franchisee who intends or would be required by such franchise or selling agreement to conduct its dealership operations from a place of business situated within the relevant market area of an existing franchisee or franchisees representing the same line make.” Pursuant to the procedures set forth in former Mass Gen Laws ch 93B, § 4 (3) (1), an existing dealer may protest the addition of a new dealership as improper, but may only do so if the proposed new *768 dealership is within its “relevant market area.” The other statute implicated in American Honda, which was the basis of the dealer’s counterclaim, was former Mass Gen Laws ch 93B, § 4 (1). That statutory guideline provides that it “shall be deemed a violation ... for any manufacturer [or] . . . distributor ... to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of said parties [including dealers] or to the public.” (Id.)
The Supreme Judicial Court of Massachusetts held that the sole statutory provision under which dealers could seek relief from the establishment of a prospective new dealership selling vehicles of same line make was the specific provision dealing with the establishment of a new dealership within that dealer’s relevant market area. In reaching this conclusion, the court reasoned as follows:
“Our interpretation of a dealer’s ‘relevant market area’ is consistent with the purpose of c. 93B. There is no question that ‘c. 93B was enacted in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers.’ ‘Section 4 (3) (1) is one of a set of provisions evidently directed to the time-honored State purpose of preserving a sound competitive market free of the domination of oligopolists at the top of a vertical chain of manufacture, distribution, and sale.’ What cannot be lost when examining the statute’s purpose, however, is the fact that in addition to governing ‘the relations among manufacturers, distributors, and dealers,’ c. 93B also applies to certain ‘transactions between dealers and the public,’ and thus, also serves to protect the public. ‘While the public and existing dealers share common interests in making sure that the existing dealers are not put out of business by unfair competition and that a stable group of dealers is able to provide sales and service on a continuing basis, the existing dealers’ interests and the public’s interests are frequently at odds. Public interest will favor increased competition in most circumstances, where the existing dealers’ interests may be opposite.’ General Laws c. 93B, § 4 (3) (1), strikes a balance between those competing interests by affording existing dealers some protection from competition (within a dealer’s ‘relevant market area’ if the proposed new dealership is found to be *769 ‘arbitrary’ under G.L. c. 93B, § 4 [3] [1]), and by likely yielding choices for consumers . . . as a result of not shielding dealers from all competition. . . .
“Dealer’s avenue to challenge the establishment of a prospective new dealership. We next consider whether G.L. c. 93B, § 4 (3) (1), is the sole provision within c. 93B under which a dealer may seek relief from the establishment of a prospective new dealership that will sell vehicles of the same line make as the existing dealer. Subsumed within this question, on review of the record, is whether a dealer may maintain an action under G.L. c. 93B, § 4 (1), to challenge a distributor’s decision to establish a new dealership as retaliatory against the dealers.[6] We conclude that § 4 (3) (1) is the sole provision available to dealers under c. 93B to challenge the establishment of a proposed new dealership.
“Section 3 (a) of G.L. c. 93B, declares ‘[u]nfair methods of competition and unfair or deceptive acts or practices, as defined in section four,’ unlawful. Section 4 specifies, in subsections 2 through 4, particular ‘acts or practices’ that shall be ‘deemed’ violations of § 3 (a). Among those deemed violations is, in § 4 (3) (1), first par., the improper grant of a new dealership ‘within the relevant market area of an existing [dealer].’ The grant of a new dealership is improper if done ‘arbitrarily and without notice to existing [dealers].’ The statute establishes a specific procedure whereby a manufacturer, or distributor, must notify certain existing dealers of its intent to establish a new dealership, . . . and whereby an existing dealer may challenge a prospective new dealership ... As previously explained, the existing dealer must demonstrate that the proposed new dealership will fall within its ‘relevant market area’ to protest its establishment.
“In contrast § 4 (1) does not proscribe a particular act or practice, but rather is more general in scope. Section 4 (1) provides: ‘It shall be deemed a violation . . . for any manufacturer [or] distributor . . . to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage *770 to any of said parties [including dealers] or to the public.’ To permit a dealer to challenge a proposed new dealership under this general provision would undermine and essentially nullify the statute, and more particularly, its standing requirement, and specific procedures, which are aimed at providing an expedient mechanism for manufacturers, distributors, and dealers ‘to test, before capital is expended or damage done, the question whether a proposed new dealership unfairly poaches on an existing dealer’s territory.’ We are bound to ‘construe the statute to avoid any part of the legislation being meaningless or duplicative.’ . . .
“Last, the fact that § 4 (3) (1) happens to have a standing requirement, does not, contrary to the dealers’ assertions, condone ‘deliberate retaliatory conduct’ by a manufacturer (or distributor), or result in a ‘loophole.’ Rather, the standing requirement reflects a legislative determination that only dealers of the same line and make, and in certain proximity to the prospective new dealership (based on a dealer’s ‘relevant market area’), may challenge and potentially prevent new competition. Chapter 93B was not intended to provide all dealers with a statutory right to seek protection from potential competition” (American Honda Motor Co., Inc. v Bernardi’s, Inc., 432 Mass at 432-436, 735 NE2d at 354-356] [citations omitted]).
Fourteen years later, the issue was revisited by the United States District Court for the District of Massachusetts in Aston Martin Lagonda of N. Am., Inc. v Lotus Motorsports, Inc. (2014 WL 1092864, 2014 US Dist LEXIS 35909 [D Mass, Mar. 18, 2014, No. 13-CV-11213]) where the plaintiff, Aston Martin Lagonda of North America, Inc. (Aston Martin), sought a declaratory judgment that it had the right to create an authorized dealership outside of the defendant’s, Lotus Motorsports, Inc. (Lotus), relevant market area. Lotus asserted counterclaims against Aston Martin alleging, inter alia, common-law causes of action as well as violations of Massachusetts General Laws ch 93.
Citing American Honda Motor Co., Inc. v Bernardi’s, Inc., the District Court dismissed the counterclaim asserting a violation of Massachusetts General Laws ch 93B and held as follows:
“Mass. Gen. L. c. 93B (‘c. 93B’) prohibits specific ‘[u]nfair methods of competition and unfair or *771 deceptive acts or practices’ in the automotive industry. Aston Martin moves to dismiss Lotus’s c. 93B claim under two theories: (1) Lotus’s claim fails under Section 6 because the location of Aston Martin’s proposed dealership falls outside of the statutorily defined boundaries; and (2) the proposed dealership would not violate any other provision of c. 93B. D. 18 at 19.
“Mass. Gen. Laws ch. 93B, § 4(a) provides that [i]t shall be a violation of . . . section 3 for any manufacturer ... to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to the . . . dealer .... Chapter 93B, § 6(a) provides that constitutes a violation of Section 3 for a manufacturer, ‘without good cause, in bad faith or in an arbitrary and capricious manner ... to permit the relocation of an existing motor vehicle dealer representing the same line make as another existing motor vehicle dealer to a site any boundary of which is within the relevant market area of an existing motor vehicle dealer which is not relocating’ . . .
“Therefore, as a threshold matter, Lotus is only entitled to relief under c. 93B, § 6 if the competing dealership is within the relevant market area, statutorily defined as ‘the entire land mass encompassed in a circle with a radius of 8 miles from any boundary of the [existing] dealership.’ Here, Lotus does not allege that the Wayland dealership is to be located fewer than eight miles from Lotus. To the contrary, Lotus has stated that ‘[o]n information and belief the locus of the proposed competing Aston Martin dealership is 8.7 miles from [Lotus’s] primary business location.’
“Further, Lotus is not entitled to relief under the other provisions of c. 93B. The Supreme Judicial Court has held that the predecessor to Section 6, which was revised to clarify the definition of ‘relevant market area,’ was the ‘sole provision available to dealers under c. 93B to challenge the establishment of a proposed new dealership.’ Am. Honda Motor Co., Inc. v Bernardi’s, Inc., 432 Mass. 425, 434, 735 N.E.2d 348 (2000). While c. 93B § 4(a) bars manufacturers from engaging in behavior that is *772 arbitrary, capricious or done in bad faith, the Bernardi court held that ‘to permit a dealer to challenge a proposed new dealership under this general provision would undermine and essentially nullify the [more specific provisions of the] statute . . . which are aimed at providing an expedient mechanism for manufacturers, distributors, and dealers to test, before capital is expended or damage done, the question whether a proposed new dealership unfairly poaches on an existing dealer’s territory.’ Lotus may not, therefore, bring a claim under the other provisions of c. 93B to challenge the establishment of a competing dealership” (Aston Martin Lagonda of N. Am., Inc. v Lotus Motorsports, Inc., 2014 WL 1092864, *3-4, 2014 US Dist LEXIS 35909, *10-13 [citations omitted]).
Similarly, in Parktown Imports, Inc. v Audi of Am., Inc. (278 SW3d 670 [Mo 2009]), which involved a state motor vehicle franchise statute with a six-mile radius requirement, Audi sought to establish a new Audi dealership in the St. Louis area. Prior to the establishment of this new dealership, there were only two authorized Audi dealers in the St. Louis area, one of which was the plaintiff, Parktown Imports, Inc. (Parktown). The new dealership was to be located approximately 10 miles east of the existing Parktown dealership.
The issue before Missouri’s Supreme Court was whether Park-town could challenge the establishment of a new franchise under former Missouri Revised Statutes § 407.825 (1), which created a general cause of action against a franchisor for conduct that was “capricious, in bad faith, or unconscionable,” or, whether Parktown was limited to advancing such a challenge under Missouri Revised Statutes § 407.817,[7] which instituted a six-mile radius relevant market area (id. at 672). In the complaint, Parktown alleged that Audi’s decision to establish a new dealership was not motivated by proper business considerations but, rather, was a capricious, bad faith or unconscionable retaliation against Parktown for refusing to move its existing facilities.
*773 The Missouri Supreme Court, like the Supreme Judicial Court of Massachusetts, determined that section 407.817 provided the sole and exclusive authority for challenging the establishment of a new motor vehicle dealership under Missouri’s Motor Vehicle Franchise Practices Act (MVFPA). According to the court:
“Section 407.817 is the only section of the MVFPA that addresses the rights and obligations of franchisors and franchisees with respect to adding new dealerships. Specifically, § 407.817 provides that, in a county with a population greater than 100,000, those franchisees within a six-mile radius of the proposed location are entitled to notice of the proposed location and the opportunity to a hearing to determine good cause for opening the proposed new location. The legislature’s intent is clear: When the population reaches a certain saturation level within a six-mile radius, franchisees within that six-mile radius are entitled to the protections of § 407.817. Outside of that six-mile radius, the legislature intended the open market to govern itself.
“Parktown, however, argues that §§ 407.817 and 407.825(1) are not in conflict because neither statute addresses the same issue. Parktown argues that § 407.817 is merely the procedural mechanism for challenging the establishment of a new franchisee location whereas § 407.825(1) contemplates a cause of action for a franchisor’s egregious behavior.
“Parktown argues this Court should write an opinion that attempts to harmonize §§ 417.825(1) and 407.817 and leave pending the litigation between these parties for a determination by the [Administrative Hearing Commission] as to whether Parktown can prove that Audi was acting in a ‘capricious, in bad faith or unconscionable’ manner in its decision to establish a third dealership in the St. Louis area. To do so, would be tantamount to judicial side-stepping of the legislature’s clear intent that § 407.817 be the sole mechanism to bring challenges to the establishment or relocation of new motor vehicle dealerships.
“The relief requested in Parktown’s complaint was a ‘final Order that [Audi] cannot open and award the proposed third point of sales to Bommarito Automotive Group and that all such contracts and *774 agreements related to this transaction are void.’ Section 407.817 governs this subject matter specifically. Parktown has no authority to contest the establishment of the third dealership under § 407.817 due to its location approximately 10 miles from the proposed new dealership. Allowing Park-town to bring a claim under § 417.825(1), solely on the basis of Audi establishing a new motor vehicle dealership, would abrogate policy decisions made by the legislature in enacting § 407.817. The legislature is the proper branch of government to weigh the policy decisions of the MVFPA. After consideration of this subject matter, the legislature enacted § 407.817, which built into the MVFPA procedures that benefit both franchisors and franchisees” (Parktown Imports, Inc. v Audi of Am., Inc., 278 SW3d at 673-674 [citations and footnotes omitted]).
Like the Missouri and Massachusetts courts, this court, as noted, concludes that Vehicle and Traffic Law § 463 (2) (cc), which specifically applies to the establishment of a new same line make dealership (or the relocation of an existing dealership) in the relevant market area of an existing dealership, provides the sole Dealer Act mechanism by which a dealer can challenge the opening (or relocation) of such a dealership in or out of that existing dealer’s relevant market area (see also BMW of N. Am., Inc. v New Motor Veh. Bd., 162 Cal App 3d 980, 209 Cal Rptr 50 [3d Dist 1984]).
Consequently, the first, second, third, fourth, fifth and seventh causes of action alleging violations of various sections of the Dealer Act—and which are premised upon Audi’s approval of a new dealership, must be dismissed.
The foregoing analysis is not applicable to the sixth cause of action, which is premised upon Audi’s alleged unreasonable refusal to agree to JJM’s proposed relocation to Hempstead, in violation of Vehicle and Traffic Law § 463 (2) (dd). Notwithstanding, in order to invoke the protection of Vehicle and Traffic Law § 463 (2) (dd), JJM was required to provide Audi with “the address of the proposed new location and a site plan of the proposed facility.” JJM has not alleged in its complaint that it provided Audi with the required site plan of its proposed facility in Hempstead, and, as such, JJM has failed to plead a cause of action for violation of this provision of the Dealer Act. Accordingly the sixth cause of action is dismissed.
In the seventeenth cause of action, JJM seeks recovery of its “necessary costs and disbursements plus a reasonable attorney’s *775 fee” pursuant to Vehicle and Traffic Law § 469 (1). However, since all of JJM’s substantive claims against Audi pursuant to the Dealer Act have been dismissed, the seventeenth cause of action must be dismissed.
Audi’s Motion to Dismiss the Common-Law Causes of Action in the Complaint and the Court’s Determination
Eighth Cause of Action
JJM contends in the eighth cause of action that pursuant to the dealer agreement,
“Audi America expressly promised and agreed to appoint plaintiff JJM Audi as an authorized dealer in Nassau County; agreed to permit JJM to operate, expand and relocate as reasonably required within the customs, standards and practices of the industry; and agreed to support [JJM’s] success by, inter alia, refraining from the establishment of unreasonably proximate same-brand competing stores” and that Audi’s actions constitute a breach of contractual duties and obligations owed to JJM (exhibit A to motion sequence No. 2 ¶¶ 144-149).
As JJM’s complaint fails to identify any provision of the dealer agreement that was actually breached by Audi, the eighth cause of action must be dismissed for failure to state a cause of action (Feld v Apple Bank for Sav., 116 AD3d 549, 550 [1st Dept 2014] [contract cause of action dismissed pursuant to CPLR 3211 (a) (7) because “plaintiff failed to allege the breach of any particular contractual provision” set forth in banking brochure]; Wesichester County Corr. Officers Benevolent Assn., Inc. v County of Westchester, 99 AD3d 998 [2d Dept 2012] [breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached]; Barker v Time Warner Cable, Inc., 83 AD3d 750 [2d Dept 2011]; Kraus v Visa Intl. Serv. Assn., 304 AD2d 408 [1st Dept 2003] [plaintiffs breach of contract claim properly dismissed for failure to state a cause of action where plaintiff failed to allege the breach of any particular contractual provision]).
Ninth Cause of Action
In the ninth cause of action, JJM alleges a claim for breach of the covenant of good faith and fair dealing implied in all contracts, including the dealer agreement and construction agreements. Specifically, JJM alleges that
*776 “Audi breached its duty of good faith and fair dealing by failing to inform JJM, during both the negotiation process to purchase the assets of Anchor Audi and for months after we became an Audi franchisee, that ‘Audi had in place a long-standing plan to take the following actions—all of which are directly counter to Audi’s duties and obligations owed to plaintiff: (a) award a new open point Audi dealership in Nassau County; (b) award that new open point Audi dealership to Biener Auto—the only other competing Audi dealer in Nassau County— whose current Audi store is located in Great Neck, New York; and (c) to locate the new Audi store in Westbury, New York—directly adjacent to one of the largest market areas in which JJM Automotive sells and services vehicles.’ . . . We further allege that ‘[i]n theory and in practice, automobile manufacturers intentionally and properly spread out their dealer network geographically so that there is sufficient distance between dealerships, so that each has a sufficient market area in which to sell and service a sufficient number of vehicles.’ . . . Audi’s placement of a competing dealer in the midst of JJM’s core market segment defies this basic industry practice. Indeed, as we allege, ‘automobile manufacturers in general understand that automobile dealers of a particular brand need to have sufficient space within which to operate in order to ensure adequate representation in a particular area while allowing each individual dealership the ability to maximize their potential and avoid duplication of market area coverage’ ” (mem of law in opposition at 30-31).
“For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff’ (Aventine Inv. Mgt. v Canadian Imperial Bank of Commerce, 265 AD2d 513, 514 [2d Dept 1999]). While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the parties’ contractual relationship, they do encompass any promises that a reasonable person in the position of the promisee would understand to be included in the parties’ agreement (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002]).
*777 Audi initially argues that the cause of action for breach of the implied covenant of good faith and fair dealing must be dismissed because it is duplicative of JJM’s express breach of contract claim. A cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is “intrinsically tied to the damages allegedly resulting from a breach of the contract” (Deer Park Enters., LLC v Ail Sys., Inc., 57 AD3d 711, 712 [2d Dept 2008] [where conduct and resulting injury alleged in cause of action alleging breach of implied covenant of good faith and fair dealing was identical to those alleged in the causes of action alleging breach of contract, breach of implied covenant of good faith and fair dealing cause of action should have been dismissed as duplicative of the breach of contract causes of action]; see also Barker v Time Warner Cable, Inc., 83 AD3d 750 [2d Dept 2011] [as pleaded in complaint, cause of action alleging breach of the implied covenant of good faith and fair dealing was dismissed as being duplicative of the cause of action alleging breach of contract]).
While some of the damages alleged in the claim for breach of the covenant of good faith and fair dealing may be “intrinsically tied” to the damages resulting from the breach of contract claim, JJM alleges additional purportedly wrongful conduct during the parties’ negotiation process that was not alleged as wrongful conduct constituting a breach of contract. Therefore, while JJM’s ninth cause of action and its breach of contract claims involve some overlap, they consist of distinct, nonduplicative independent claims (see Dialcom, LLC v AT & T Corp., 20 Misc 3d 1111[A], 2008 NY Slip Op 51315[U] [Sup Ct, Kings County 2008]).
Audi also argues that the implied covenant cannot be used to “override the express terms of the contract” as the implied prohibition would be contrary to the express terms of the standard provisions, which provides that “[t]his Agreement does not give Dealer any exclusive right to sell or service Authorized Products in any area or territory” (exhibit 2 to motion sequence No. 1, art 2 [1]).[8]
Although it is true that “no obligation can be implied that ‘would be inconsistent with other terms of the contractual relationship’ ” (Dalton v Educational Testing Serv., 87 NY2d 384, *778 389 [1995]), a similar argument advanced by Audi was rejected by the Second Department in Legend Autorama, Ltd. v Audi of Am., Inc. (100 AD3d 714 [2d Dept 2012]).
In Legend Autorama, the Appellate Division denied that branch of Audi’s motion for summary judgment dismissing the cause of action for breach of the implied covenant of good faith and fair dealing and held:
“Contrary to Audi’s contention, the dealer plaintiffs’ claim that is based on the alleged breach of the covenant of good faith and fair dealing is not inconsistent with the nonexclusivity provision of the ‘standard provisions’ that are incorporated into the Dealer Agreements. While Audi retained the discretion to add newly franchised dealers within the existing dealers’ territories, ‘even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party’s right to the benefit under the agreement’ ” (id. at 716 [citations omitted]).[9]
Accepting as true JJM’s allegations that Audi’s actions were not “undertaken in good faith,” the ninth cause of action pleads a claim for breach of the covenant of good faith and fair dealing. Consequently, Audi’s motion, insofar as it seeks dismissal of JJM’s ninth cause of action, must be denied.
Tenth Cause of Action
In the tenth cause of action, a claim for breach of fiduciary duty, JJM alleges that the dealer agreement “prescribes specific and detailed ownership, management, facility, financial, sales, service, customer satisfaction and other requirements and obligations for JJM Audi” and that “Audi America has imposed on JJM Audi an essentially non-negotiable standard form of Dealer Agreement, which effectively regulates virtually every aspect of the dealership’s retail business.” JJM also pleads that Audi has direct supervision over JJM’s operations and requires detailed monthly financial statements, and that Audi has the right to audit all aspects of JJM’s business (exhibit A to motion sequence No. 2 ¶¶ 155-156).
*779 JJM further alleges the following in its complaint:
“Audi America’s direct supervision over JJM Audi’s operations requires, among other reporting requirements, that JJM Audi submit to Audi America detailed monthly financial statements on all aspects of daily business, including for example new and used car sales, inventory, parts sales, and extensive other confidential financial information, all as prescribed by standard forms created by Audi America.
“Audi America has the contractual right to audit all aspects of JJM Audi’s business. . . .
“The Dealer Agreement and the franchise relationship: ‘place Audi America in a position of disproportionate control, power, superiority, influence, and dominance over [JJM]; require JJM Audi to provide confidential and proprietary information to Audi America, creating a confidential relationship, and make JJM Audi dependant upon Audi America for economic survival, forcing JJM Audi to repose special trust and confidence in Audi of America.’ “Pursuant to the Dealer Agreement and the resulting Franchise relationship between the parties, Audi America controls most aspects of JJM Audi’s business and Defendant is permitted to terminate the Dealer Agreement for breaches of most of the obligations imposed on JJM Audi therein.
“The aforementioned effects of the Dealer Agreement upon the relationship between the parties, and the obligations Audi America owes JJM Audi as a result of the Franchised Dealer Act, establish a fiduciary relationship between Audi America and JJM Audi” (exhibit A to motion sequence No. 2 ¶¶ 169-170, 173-175).
According to JJM, the foregoing establishes a fiduciary relationship between Audi and JJM and, as a fiduciary, “Audi America owes [JJM] the highest degree of loyalty and good faith,” and that the wrongful acts of Audi constitute a breach of that fiduciary duty owed to JJM (exhibit A to motion sequence No. 2 ¶ 177).
A conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties’ business relationship to a fiduciary one. The general rule is that
*780 there is no fiduciary relationship between a franchisee and a franchisor (.Marcella & Co. v Avon Prods., 282 AD2d 718 [2d Dept 2001]).
Although the franchisor-franchisee relationship does not give rise to fiduciary obligations absent rare or exceptional circumstances, JJM has alleged that a number of terms contained in the dealer agreement and standard provisions agreement establish that Audi has a significant degree of dominance and control over JJM and “contain numerous detailed and burdensome obligations on JJM” sufficient to make the instant matter one of those “rare” cases giving rise to a fiduciary relationship (see A. S. Rampell, Inc. v Hyster Co., 3 NY2d 369, 376 [1957] [certain contractual terms (i.e., plaintiff company’s requirement to provide to defendant the list of prospective customers and records of business activities, inventory and financial situation), combined with the “dependency” inherent in the manufacturer/ distributor relationship, were sufficient to plead a relationship giving rise to fiduciary duties]; Lake Erie Distribs. v Martlet Importing Co., 221 AD2d 954, 955-956 [4th Dept 1995] [recognizing that a “distributorship agreement may, in some rare instances, create a confidential relationship out of which a duty of fiduciary care arises,” the Fourth Department held that “(w)hether plaintiff was obliged to accept the requirements allegedly imposed by defendants because of defendants’ position of dominance or whether plaintiff assumed such obligations voluntarily are questions of fact not properly decided on a motion to dismiss”]).
Notwithstanding the foregoing, under similar circumstances, this argument was rejected by the Second Department in Legend Autorama, Ltd. v Audi of Am., Inc. (100 AD3d 714 [2d Dept 2012]). In Legend Autorama, two Audi dealerships in Suffolk County, New York executed substantially similar dealer agreements with Audi of America. Thereafter, Audi created a new Audi dealership in Suffolk County, which bordered the market areas assigned to the two other Audi dealerships in Suffolk County and resulted in portions of their market areas being “reassigned” to the new dealership. Accordingly, both of the existing Suffolk County dealerships commenced an action against Audi and its chief operating officer seeking injunctive relief as well as damages for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and tortious interference with contract.
Audi moved for summary judgment dismissing the complaint. The Supreme Court, Suffolk County (Emerson, J.) denied Audi’s *781 motion and with respect to the breach of fiduciary claim, the court stated:
“Generally, there is no fiduciary relationship between a franchisor and a franchisee (Akkaya v Prime Time Transp., Inc., 45 AD3d 616, 617 [and cases cited therein]). A distributorship agreement may, in some rare instances, create a confidential relationship out of which a duty of fiduciary care arises (see, Lake Erie Distribs. v Marlet Importing, 221 AD2d 954, 955). A distributor enjoys a fiduciary relationship with a manufacturer when the manufacturer has a position of dominance over the distributor, the distributor invests time and money in the manufacturer’s business, and the parties’ contract obligates the distributor to reveal proprietary information to the manufacturer (Zimmer-Masiello, Inc. v Zimmer, Inc., 159 AD2d 363, 365, citing A.S. Rampell, Inc. v Hyster Co., 3 NY2d 369, 376-377; see also, Manhattan Motorcars, Inc. v Automobili Lamborghini, S.p.A., 244 FRD 204, 219-220; Beautiful Jewellers Private Ltd. v Tiffany & Co., US Dist Ct., SDNY, March 21, 2007, Wood, J. [2007 WL 867202], at *5). While Audi urges the court to apply the general rule and find that it owes no fiduciary duty to Smithtown Audi and Huntington Audi, they have raised factual issues concerning the nature and extent of their relationship with Audi, which requires the denial of summary judgment (see, Zimmer-Masiello, Inc. v Zimmer, Inc., supra at 366).” (Legend Autorama, Ltd. v Audi of Am., Inc., 32 Misc 3d 1216[A], 2011 NY Slip Op 51346[U], *3-4 [Sup Ct, Suffolk County 2011] [subsequent history omitted].)
In modifying the Supreme Court’s order, the Second Department rejected the claim that the relationship between Audi and its Suffolk County dealers involved one of those “rare instances” which could give rise to a confidential relationship and dismissed the cause of action for breach of fiduciary duty (Legend Autorama, Ltd. v Audi of Am., Inc., 100 AD3d at 717). Specifically, the Court held:
“[T]he Supreme Court should have granted that branch of Audi’s motion which was for summary judgment dismissing, insofar as asserted against it, the third cause of action in the second amended complaint, which alleged a breach of fiduciary duty. *782 A conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties’ business relationship to a fiduciary one. The general rule is that there is no fiduciary relationship between a franchisee and a franchisor. While the relationship between automobile manufacturers and dealers is recognized as one characterized by a dealer’s dependency upon the manufacturer, this dominance, taken alone, is insufficient to establish a confidential relationship.” (Legend Autorama, Ltd. v Audi of Am., Inc., 100 AD3d at 717 [citations omitted].)
Given the Second Department ruling in Legend Autorama, this court concludes that the relationship between Audi and JJM is not one of those rare instances creating a confidential relationship out of which a duty of fiduciary care arises. Accordingly, the tenth cause of action alleging a breach of fiduciary duty is dismissed.
Eleventh Cause of Action
In the eleventh cause of action, a claim based upon the principle of promissory estoppel, JJM alleges that during the acquisition of the dealership and the execution of the dealer agreement and construction agreements, Audi America made “repeated, clear and unambiguous promises” to JJM that they “would support JJM Audi’s expansion, relocation and growth as the exclusive Audi retailer in JJM Audi’s designated market and that Audi America would position JJM Audi to become the most successful Audi retailer in Nassau County” and for this reason Audi America should be estopped from awarding the “third, redundant competing Audi point in Nassau County” (exhibit B to motion sequence No. 2 ¶¶ 181, 183).
“To establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise” (Gurreri v Associates Ins. Co., 248 AD2d 356, 357 [2d Dept 1998], quoting Rogers v Town of Islip, 230 AD2d 727 [2d Dept 1996]). However, the doctrine of promissory estoppel is limited to cases where the promisee suffered an “unconscionable injury” (Halliwell v Gordon, 61 AD3d 932, 934 [2d Dept 2009]; AHA Sales, Inc. v Creative Bath Prods., Inc., 58 AD3d 6 [2d Dept 2008]).
*783 The existence of a valid and enforceable contract precludes recovery on the theory of promissory estoppel for a claim arising out of the same subject matter and, thus, the eleventh cause of action must be dismissed (Grossman v New York Life Ins. Co., 90 AD3d 990, 992 [2d Dept 2011]; Orchard Hotel, LLC v D.A.B. Group, LLC, 43 Misc 3d 1201 [A], 2014 NY Slip Op 50441[U] [Sup Ct, NY County 2014] [enforceable contract with defendant bars plaintiffs proposed cross claim for promissory estoppel]).
Fifteenth Cause of Action
In the fifteenth cause of action, JJM alleges that it relied on Audi’s “misrepresentations” that JJM Audi “was positioned to become the largest Audi Dealer in Nassau County,” when Audi had in place an “existing plan to open a third Audi dealership in the most critical segment of JJM Audi’s market.” According to JJM, Audi had a duty to disclose plans to open a third dealer in the Westbury, New York market area and its failure to disclose constituted an omission that was “materially false and misleading, had no good faith basis in fact, and [was] employed as part of a scheme through which Audi America wrongfully induced plaintiff to obligate itself to construct a new facility, at substantial expense” (exhibit A to motion sequence No. 2 ¶¶ 201, 203).
However, this alleged misrepresentation lacks the requisite specificity to be actionable (Weinstein v City of New York, 103 AD3d 517, 518 [1st Dept 2013]).
In opposition, JJM seeks to correct this pleading deficiency with the affidavit of John Pickett, JJM’s general manager. In his affidavit, Pickett alleges specific conversations with Jeff Tolerico, Audi’s Eastern region manager, wherein Tolerico stated that Audi wanted JJM “to be the premier [Audi] dealership in Nassau” (Pickett aff in opposition ¶ 6). However, Tolerico’s statement amounts to no more than an expression of hope and future expectation or opinion and puffery (NRT N.Y., LLC v Laffey, 103 AD3d 861, 862 [2d Dept 2013]; Consolidated Bus Tr., Inc. v Treiber Group, LLC, 97 AD3d 778, 779 [2d Dept 2012]; High Tides, LLC v DeMichele, 88 AD3d 954, 958 [2d Dept 2011]; Crossland Sav. v SOI Dev. Corp., 166 AD2d 495 [2d Dept 1990]). For this reason, the identified statement cannot form the basis of a fraudulent inducement claim.
To the extent that the fifteenth cause of action is based upon Audi’s failure to disclose its plan to open a third dealership in Nassau County, rather than an affirmative misrepresentation, *784 the absence of a fiduciary or confidential relationship between the parties precludes any duty to make affirmative disclosure (Kevin Kerveng Tung, P.C. v JP Morgan Chase & Co., 105 AD3d 709, 711 [2d Dept 2013]).
JJM nevertheless insists that the instant case falls within the “special facts” doctrine, pursuant to which there is an affirmative duty to disclose a material fact where the information is “peculiarly within [the] knowledge” of the non-disclosing party, and the information could not have been discovered by the other party through the “exercise of ordinary intelligence” (Jana L. v West 129th St. Realty Corp., 22 AD3d 274, 277-278 [1st Dept 2005]). “[If] the other party has the means available to him of knowing ... he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations” (Schumaker v Mather, 133 NY 590, 596 [1982]).
While JJM’s general manager stated in his affidavit that Audi did not disclose its intention to award a new franchise location in Westbury and that JJM “had no way of learning of that plan other than from Audi America” (Pickett aff in opposition ¶ 16), there is no allegation in the complaint that JJM inquired of either Audi of America or Anchor Audi about the opening of an additional dealership in Nassau County. In this regard, the court notes the following paragraphs in JJM’s complaint:
“Since December 19, 2013, plaintiff has been informed by the former dealer principal of Anchor Audi that, as far back as the time that the JJM Audi and its principals began to first negotiate the purchase of the assets of Anchor Audi, Audi America already had in place an existing plan to establish an Audi dealership in Nassau County, in the West-bury market area.
“Indeed, Audi America approached the principal of Anchor Audi as early as 2012 to discuss his interest in either renovating or relocating his facility as far north as Westbury, from where he could continue to service and support his existing territory reaching south to the South Shore of Nassau County” (exhibit A to motion sequence No. 2 ¶¶ 36-37).
The general manager of JJM similarly stated in his affidavit that
“[a]fter receiving Audi America’s December 19 letter, we learned from the former principal of Anchor *785 Audi, Ed Walsh, that as far back as the time that Audi first began recruiting us to purchase the assets of Anchor Audi, Audi had in place an existing plan to establish a third Audi dealership in Nassau County” (Pickett aff in opposition ¶ 15).
Inasmuch as JJM alleges that Anchor Audi was aware of Audi’s intention to open a dealership in Westbury, yet fails to allege that it exercised any “ordinary intelligence,” much less made a simple inquiry, as to the opening of another dealership in Nassau County, the court concludes that the special facts doctrine does not apply (see Jana L. v West 129th St. Realty Corp., 22 AD3d at 277-278). Accordingly, the fraudulent inducement claim in the fifteenth cause of action is dismissed.
Sixteenth Cause of Action
In the sixteenth cause of action, JJM contends there was a special relationship between the parties, “which created a duty on the part of Audi America to impart correct information” to JJM (exhibit A to motion sequence No. 2 ¶ 210). JJM further pleads that
“Audi America at relevant times while plaintiff JJM Audi was operating under the Dealer Agreement, omitted to inform plaintiff of critical material information, including particularly Audi America’s intention ... to award a new open point for the sale of Audi vehicles in [JJM’s] market, and instead made other statements to [JJM] and its principals concerning Audi America’s intention to support [JJM] in expanding, relocating, and growing to become a highly successful dealership operation” (exhibit A to motion sequence No. 2 ¶ 211).
In order to prevail on a cause of action sounding in negligent misrepresentation, a plaintiff is required to demonstrate: privity of contract between the plaintiff and the defendant or a relationship “so close as to approach that of privity”; that the information was incorrect; and reasonable reliance on the information (Sykes v RFD Third Ave. 1 Assoc., LLC, 15 NY3d 370, 372 [2010]; Ramsarup v Rutgers Cas. Ins. Co., 98 AD3d 494, 496 [2d Dept 2012]).
According to the Court of Appeals, which specifically dealt with the nature of the duty that may give rise to liability for negligent misrepresentation:
“In the commercial context, a duty to speak with care exists when ‘the relationship of the parties, *786 arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information.’ This reliance must be justifiable, as a ‘casual response given informally does not stand on the same legal footing as a deliberate representation for purposes of determining whether an action in negligence has been established.’
“Since a vast majority of commercial transactions are comprised of such ‘casual’ statements and contacts, we have recognized that not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care. Rather, liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified. Professionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients, and in certain situations we have imposed liability for negligent misrepresentation when they have failed to speak with care.
“The analysis in a commercial case such as this one is necessarily different from those cases because of the absence of obligations arising from the speaker’s professional status. In order to impose tort liability here, there must be some identifiable source of a special duty of care. The existence of such a special relationship may give rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech” (Kimmell v Schaefer, 89 NY2d 257, 263-264 [1996] [citations omitted]; see also Fresh Direct v Blue Martini Software, 7 AD3d 487 [2d Dept 2004]).
The existence of a duty is an issue of law for the court to decide (Kimmell v Schaefer, 89 NY2d at 263 [liability for negligence may result only from the breach of a duty running from the tortfeasor to the injured party]). Here, the court concludes that, given the commercial nature of the transaction as well as the knowledge, skill and expertise of JJM and Audi in *787 the field of franchised car dealerships, Audi did not have a special duty of care owing to JJM.[10]
Accordingly, the sixteenth cause of action must be dismissed.
Motion by the Biener Defendants to Dismiss the Complaint Insofar as Asserted against Them and the Court’s Determination
The Biener defendants move for an order pursuant to CPLR 3211 (a) (1) and (7) and CPLR 3013 dismissing the seventh, twelfth, thirteenth and fourteenth causes of action asserted against them in the complaint.[11]
JJM claims in the twelfth cause of action for tortious interference with contract that the Biener defendants had knowledge of JJM’s dealer agreement with Audi and they have “induced Audi America to breach the Dealer Agreement or to otherwise render performance under the Dealer Agreement impossible” (exhibit A to motion sequence No. 2 ¶¶ 187-188).
The elements of a claim for tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant’s knowledge of that contract; (3) the defendant’s intentional procurement of the third party’s breach of that contract without justification; (4) actual breach of the contract; and (5) resulting damages (see Lama Holding Co. v Smith Barney, 88 NY2d 413, 424 [1996]). To avoid dismissal of a tortious interference claim, a plaintiff must support his claim with more than speculation (Ferrandino & Son, Inc. v Wheaton Bldrs., Inc., LLC, 82 AD3d 1035, 1036 [2d Dept 2011]).
Here, JJM failed to allege that the dealer agreement would not have been breached “but for” the Biener defendants’ conduct (see 68 Burns New Holding, Inc. v Burns St. Owners Corp., 18 AD3d 857, 858 [2d Dept 2005]; Washington Ave. Assoc. v Euclid Equip., 229 AD2d 486 [2d Dept 1996]). In addition, the allegations in the complaint are bare legal conclusions un *788 supported by any factual basis and are thus not presumed to be true nor are they accorded every favorable inference (see Nagan Constr., Inc. v Monsignor McClancy Mem. High Sch., 117 AD3d 1005, 1006 [2d Dept 2014]; Breytman v Olinville Realty, LLC, 54 AD3d 703, 704 [2d Dept 2008]; Morris v Morris, 306 AD2d 449 [2d Dept 2003]).
In any event, in light of the court’s dismissal of JJM’s breach of contract claim, JJM’s claim for tortious interference with contract must also be dismissed (see 397 W. 12th St. Corp. v Zupa, 34 AD3d 236 [1st Dept 2006]).
Thirteenth Cause of Action
In the thirteenth cause of action for aiding and abetting breach of fiduciary duty, JJM contends that the Biener defendants have
“knowingly participated in defendant Audi America’s aforesaid breach of fiduciary duty by, inter alia, substantially assisting Audi America in the planning and development of a competing Audi store in the territory serviced by JJM Audi and by accepting or agreeing to accept an open point from Audi America in connection therewith” (exhibit A to motion sequence No. 2 ¶ 192).
In order to sustain a claim for aiding and abetting breach of fiduciary duty, a plaintiff must demonstrate: a breach of fiduciary duty owed to the plaintiff; that the defendant knowingly induced or participated in the breach; and the plaintiff suffered damage as a result of the breach (Baron v Galasso, 83 AD3d 626 [2d Dept 2011]; Yuko Ito v Suzuki, 57 AD3d 205, 208 [2008]; Kaufman v Cohen, 307 AD2d 113, 125 [1st Dept 2003]).
However, in the absence of a viable claim for breach of fiduciary duty, the related claim of aiding and abetting breach of fiduciary duty necessarily fails (see Kagan v HMC-New York, Inc., 94 AD3d 67 [1st Dept 2012]; Linden v Moskowitz, 294 AD2d 114 [1st Dept 2002]; Small v Lorillard Tobacco Co., 94 NY2d 43, 57 [1999]). Accordingly, the thirteenth cause of action must be dismissed.
Fourteenth Cause of Action
JJM asserts in the fourteenth cause of action that the Biener defendants have been unjustly enriched with the award of a new open point for the sale of Audi vehicles and that it is “against equity and good conscience to permit Weinstock and Biener Auto to retain what they have unjustly procured” (exhibit A to motion sequence No. 2 ¶¶ 196-198).
*789 “The essence of unjust enrichment is that one party has received money or a benefit at the expense of another” {Levin v Kitsis, 82 AD3d 1051, 1053 [2d Dept 2011] [citations omitted]). To prevail on a claim for unjust enrichment, a plaintiff must establish that the defendant benefitted at the plaintiffs expense and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered (id.; Whitman Realty Group, Inc. v Galano, 41 AD3d 590 [2d Dept 2007]; Citibank, N.A. v Walker, 12 AD3d 480 [2d Dept 2004]).
In its memorandum of law in opposition, JJM argues that the complaint, both explicitly and implicitly, alleges that the Biener defendants received a benefit at JJM’s expense. Specifically, according to JJM:
“The Complaint alleges in exacting detail that Weinstock and Biener were awarded a new Audi dealership franchise in Westbury, New York, which will effectively cede complete control over the Garden City market—a territory squarely within JJM’s primary market area and currently serviced by JJM—to Biener in violation of the Dealer Act, the Dealer Agreement and the common law of New York. As a direct result of the award of the new dealership in violation of JJM’s rights, JJM will lose, and Weinstock and Biener will gain, at least 20% of its sales volume along with additional objective-based awards from Audi” (mem of law in opposition at 38).
“[A] plaintiff’s allegation that the [defendant] received benefits, standing alone, is insufficient to establish a cause of action to recover damages for unjust enrichment” (Goel v Ramachandran, 111 AD3d 783, 791 [2d Dept 2013]; Old Republic Natl. Tit. Ins. Co. v Cardinal Abstract Corp., 14 AD3d 678, 680 [2d Dept 2005]).
JJM has not alleged that it had any entitlement to the benefit conferred; instead, JJM bases its claims on its alleged “reasonable expectation that there would continue to be only two Audi stores within Nassau County, the one store operated by Biener Auto, and the one now controlled by JJM Audi” (exhibit A to motion sequence No. 2 ¶ 66). Moreover, JJM’s unjust enrichment claim does not indicate how it is “against equity and good conscience” to permit the Biener defendants to open the new Audi’s Dealership other than JJM’s claim that it will potentially lose 20% of its own business. On this record, JJM has no cause of action against the Biener defendants for unjust *790 enrichment and the fourteenth cause of action is hereby dismissed.
Replead
In the last paragraph of JJM’s attorney’s affirmation in opposition to the motion, JJM asks that “in the unlikely event that the Court grants any portion of either defendants’ motions, JJM requests leave to replead the allegations in the Complaint pursuant to NY CPLR 3211 (e)” (affirmation in opposition ¶ 11). Inasmuch as repleading under CPLR 3211 (e) was repealed by Laws of 2005 (ch 616) and took effect on January 1, 2006, JJM’s request to replead under CPLR 3211 (e) is denied.
Conclusion
Based on the foregoing, it is hereby ordered that the motion by Volkswagen Group of America, Inc. doing business as Audi of America, Inc. to dismiss the complaint insofar as asserted against it, is granted to the extent that the complaint is dismissed insofar as asserted against it, except as to the ninth cause of action, with respect to which the motion is denied; and it is further ordered that the motion by defendants Stanley Weinstock and Biener Auto Group, Inc. to dismiss the seventh, twelfth, thirteenth and fourteenth causes of action asserted against them is granted.

. Pursuant to Vehicle and Traffic Law § 469 (1): All further references herein to sections of the Dealer Act, are references to the same-numbered sections of the Vehicle and Traffic Law.

. Pursuant to Vehicle and Traffic Law § 463 (2) (ff) (3):
“A modification is deemed unfair if it is not undertaken in good faith; is not undertaken for good cause; or would adversely and substantially alter the rights, obligations, investment or return on investment of the franchised motor vehicle dealer under an existing franchise agreement. In any action brought by the dealer, the franchisor shall have the burden of proving that such modification is fair and not prohibited.”

. According to the complaint, 20% of all of JJM’s sales and service business stems from towns and villages closer to Westbury than Lynbrook (exhibit A to motion sequence No. 2 ¶¶ 78-79).

. Pursuant to Vehicle and Traffic Law § 463 (2) (cc) (1):
“It shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract . . . [t]o enter into a franchise establishing an additional new motor vehicle dealer or relocating an existing new motor vehicle dealer into the relevant market area of an existing franchise motor vehicle dealer of the same line make unless the franchisor provides notice pursuant to the terms of this subdivision. All dealers that have a relevant market area that encompasses the proposed site shall be entitled to written notice, via certified mail return receipt requested, informing them of the proposed addition or relocation. Any new motor vehicle dealer may institute an action as provided in section four hundred sixty-nine of this article to protest the establishment or relocation of the new motor vehicle dealer following receipt of such notice, or following the end of any appeal procedure provided by the franchisor. In any action brought by the dealer, the franchisor shall have the burden of proving that there exists good cause for any such addition or relocation. Institution of an action pursuant to this subdivision shall serve to stay, without bond, the proposed addition or relocation until a final judgment has been rendered in a proceeding or action as provided in section four hundred sixty-nine of this article.”

. A review of the legislative history demonstrates that article 17-A of the Vehicle and Traffic Law, which regulates motor vehicle manufacturers, distributors and dealers,
“was adopted to protect the interests of the public, the economy of the State, public welfare, and as a means of exerting the State’s police power. The intent, which is clearly stated, is to prevent frauds, impositions and other abuses upon the citizenry and to protect and preserve such citizens’ investments and properties” (Letter from Consumer Protection Bd, July 11, 2008, Bill Jacket, L 2008, ch 490 at 20).
“This bill serves the public interest by better balancing the relationship between franchisors and franchised dealers. The franchise system helps to assure vigorous competition, which is beneficial to consumers” (Letter from Senator Johnson, July 30, 2008, Bill Jacket, L 2008, ch 490 at 7).

. In American Honda, the dealers alleged that Honda proposed the new dealership to retaliate against them for their involvement in other litigation against Honda.

. Section 407.817 was enacted in 2001 as a framework to address the rights and obligations of franchisors and franchisees with respect to adding new dealerships and, more specifically, comprehensively addressed how a franchisee can protest a franschisor’s decision to add an additional sales point within a relevant market area 9Parktown Imports, Inc. v Audi of Am., Inc., 278 SW3d at 673).

. The standard provisions agreement is expressly made a part of the dealer agreement.

. See also Lonner v Simon Prop. Group, Inc., 57 AD3d 100, 108 (2d Dept 2008) (“Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance . . . This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion”); Manhattan Motorcars, Inc. v Automobili Lamborghini, S.p.A., 244 FRD 204 (SD NY 2007).

. Moreover, Audi’s purported misrepresentations to JJM concerning “Audi America’s intention to support [JJM] in expanding, relocating, and growing to become a highly successful dealership operation” (exhibit A to motion sequence No. 2 ¶ 211) may not form the basis of a claim for negligent misrepresentation “since they are conclusory and/or constitute mere puffery, opinions of value or future expectations” (Sheth v New York Life Ins. Co., 273 AD2d 72, 74 [1st Dept 2000]).

. See supra (at 762-763) for the court’s discussion dismissing the seventh cause of action.